UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| DAVID PATTERSON, | ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. 2:14-cv-00310-LJM-DKL |
| UNITED STATES OF AMERICA, | ) ) ) |
| Defendant. | ) |

**Entry Denying Defendant's Motion for Partial Summary Judgment
and Directing Further Proceedings**

For the reasons explained in this Entry, the defendant's motion for partial summary judgment [dkt. 58] is **denied**.

# I.
# Background

Plaintiff David Patterson is a federal inmate currently incarcerated at the Devens Federal Medical Center, but at all times relevant to this action was in custody at the United States Penitentiary in Terre Haute, Indiana ("USP-TH"). Mr. Patterson brings five claims against the United States pursuant to the Federal Tort Claims Act (the "FTCA") for injuries he suffered from multiple suicide attempts that occurred at USP-TH in late 2012. *See* 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671, *et seq*. In his first four claims, Mr. Patterson contends that staff at USP-TH were negligent by failing to adequately treat his underlying conditions and by failing to protect him from suicide attempts. His fifth claim regards an alleged instance of excessive force by USP-TH staff.

Defendant United States moves for summary judgment only as to the first four of Mr. Patterson's claims. Moreover, the United States does not move for summary judgment on the entirety of these claims, but only insofar as they are predicated on negligent psychiatric treatment.

## II.
## Summary Judgment Standard

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 550 U.S. 372, 380 (2007).

## III.
## Discussion

### A.    Undisputed Facts

The following facts are undisputed or, if disputed, taken in the light most favorable to Mr. Patterson for purposes of this motion. The facts are organized according to the four claims at issue in the United States' motion and the events preceding each of those claims.

Mr. Patterson was incarcerated at the United States Penitentiary in Allenwood, Pennsylvania ("USP Allenwood") before he was transferred to USP-TH. While at USP

Allenwood, Mr. Patterson had expressed suicidal thoughts and had intermittently been placed on suicide watch. He also engaged in various forms of self-harm and had made a noose on multiple occasions. Mr. Patterson was transferred from USP Allenwood to USP-TH in September 2012.

### 1. Claim 1 – Attempted Hanging on October 22, 2012

On October 15, 2012, Mr. Patterson complained to Officer Weyrauch that he was experiencing suicidal thoughts and showed Officer Weyrauch a noose he had made. He was left alone for thirty minutes and was attempting to hang himself when USP-TH staff approached his cell. Mr. Patterson agreed to hand over the noose, but he felt that his suicidal thoughts were not taken seriously. Mr. Patterson demanded a restart of the anti-depressant, mirtazapine. A mental health examination was conducted, but the reported results were unremarkable.

On October 19, 2012, Mr. Patterson informed Officers Weyrauch, Booker, and Turner and Dr. Willard that he was suicidal and needed to be placed on suicide watch because he wanted to hang himself. The next day, October 20, Mr. Patterson again reported suicidal thoughts and showed USP-TH staff a noose he had made. Mr. Patterson subsequently held his cellmate hostage but the incident was resolved without injury. He was examined by staff, but they reported no abnormalities regarding his mental health.

On October 21, USP-TH staff noticed a noose hanging from Mr. Patterson's cell, and Mr. Patterson informed them of his intent to harm himself. After he was removed from his cell, Mr. Patterson was eventually escorted back to his cell that he had occupied with a cellmate.

On October 22, USP-TH staff observed Mr. Patterson attack his cell mate. Mr. Patterson was again removed from his cell, but on this occasion he was placed in a single cell. He told Officer Turner that he would hang himself if placed in a cell with bedsheets. Nevertheless, Mr. Patterson was placed in such a cell, and he covered the cell window, made a noose from a bed

3

sheet, and hanged himself from the light fixture. He was cut down by USP-TH staff within a minute of the incident. Mr. Patterson reported that he hanged himself volitionally because his care providers were not giving him sufficient attention. Mr. Patterson was subsequently sent to an outside hospital for imaging to determine if he had a neck injury, and he reported that he no longer had suicidal intent. When he returned to USP-TH, his suicide risk level was increased from low to moderate.

Two days later, on October 24, Mr. Patterson expressed to staff that he might be suicidal again. He stated this after the psychologist refused to testify on his behalf at an upcoming disciplinary hearing. A safety plan was put into place if Mr. Patterson continued to have suicidal ideation.

### 2. Claim 2 – Attempted Overdose on November 7, 2012

On the afternoon of November 6, 2012, a psychology staff member responded to a report of Mr. Patterson having thoughts of setting his cellmate on fire and harming himself. Mr. Patterson complained, among other things, of not having his psychiatric medications. Mr. Patterson was ordered to take Prozac for his suicidal ideation and anxiety disorder.

Later that afternoon, Mr. Patterson was found lying on the floor of his cell with a bleeding left wrist laceration. He had written the words "HATE" and "KILL" in blood on the walls. Mr. Patterson reported that he cut his wrist to draw the attention of staff so they would facilitate the start of his medication that he had not yet received.

Mr. Patterson's Prozac was prescribed as self-carry rather than distribution via the pill line. Therefore, the following day, November 7, Mr. Patterson was distributed sixty Prozac tablets by Nurse Shaults. Mr. Patterson expressed depressed thoughts and thoughts of self-injury, but denied any urge to act on them.

On November 8, 2012, Mr. Patterson showed Lt. Richard his bottle of sixty Prozac. Mr. Patterson refused to give the medication to staff and was thus left in his cell with it. Around 12:45 p.m., Mr. Patterson gave Officer Weyrauch the empty Prozac bottle. Officer Weyrauch returned to Mr. Patterson's cell fifteen minutes later and told him he should not have taken the Prozac.

A few hours later, Mr. Patterson was found lying on his cell floor non-responsive. On removal from his cell, Mr. Patterson reported that he swallowed all sixty Prozac approximately thirty minutes before. Mr. Patterson was taken to the hospital. While there, he complained of hearing voices telling him to do things. Prozac was discontinued and Resperidone and Venlafaxine were prescribed through pill-line administration. Medical providers at the hospital stated that Mr. Patterson was in need of "aggressive psycho evaluation" and that he "needs to be on suicidal watch." Dkt. 59-12 at 3.

Mr. Patterson returned to USP-TH on November 9, 2012. He was placed on a behavior management plan, which provided daily monitoring of his condition and allowed him to gain or lose possessions based on his ability to manage them. Mr. Patterson was also provided a tear resistant smock, bare mattress, rationed toilet paper, and finger food on a Styrofoam tray. There is no evidence, however, that Mr. Patterson was placed on suicide watch, as recommended by the medical providers at the hospital.

### 3. Claim 3 – Suicide Attempts on November 11-12, 2012

On November 11, 2012, Mr. Patterson found a shaving razor on his cell floor and swallowed it in front of Officer Brooks. The next day, November 12, Mr. Patterson fashioned a noose from his mattress and hanged himself from the light fixture in his cell. He was again sent to the hospital for treatment. He described the hanging as a suicide attempt and reported suicidal ideation.

Mr. Patterson remained at the hospital for observation through November 16. Upon his return to USP-TH, he inquired when he would be receiving the medications prescribed by the hospital providers, which were an increased dosage of Venalfaxine, Buproprion, and continued use of Risperidone. Psychology notes from this time reflect that he was on Fluoxetine, while medication administration records suggest that he was being provided different medications.

Mr. Patterson was seen by mental health staff on at least November 19 and November 20. On November 20, it was recommended that Mr. Patterson have an x-ray to follow the passage of the razor blade he swallowed, but Mr. Patterson refused an x-ray, so one was not performed.

### 4. Claim 4 – Suicide Attempt and Self-Harm on December 4, 2012

On December 2, 2012, Mr. Patterson reported to psychology staff that he was having thoughts of cutting himself and heard voices that told him to do so. Two days later, on December 4, Mr. Patterson made a noose and showed it to USP-TH staff, while claiming that he took pills and swallowed a razor. Mr. Patterson also cut his right calf with a razor and inserted a toothbrush into his leg. Mr. Patterson informed medical staff what he did, but they said they could not locate a toothbrush so they cleaned and stitched the wound with the toothbrush still inside his leg.

On December 11, 2012, Mr. Patterson defecated a razor that he had swallowed several days earlier. Over the next several days, he complained to staff of leg pain because the toothbrush remained in his leg, yet the examination of his leg did not lead to further treatment.

On January 3, 2012, Mr. Patterson hanged himself in his cell. He was found by his cellmate lying on the floor in a pool of his own vomit with the noose still around his neck. Mr. Patterson was taken to the hospital, and he complained of right foot and neck pain. A surgeon at the hospital removed the toothbrush from his leg.

### B. FTCA Legal Standards

The FTCA permits a person to bring suit against the United States:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). This provision allows "federal inmates [to] bring suit for injuries they sustain in custody as a consequence of the negligence of prison officials." *Buechel v. United States*, 746 F.3d 753, 758 (7th Cir. 2014).

"[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law." *Molzof v. United States*, 502 U.S. 301, 305 (1992). Under Indiana law, "[t]o prevail on a claim of negligence the plaintiff must show: (1) duty owed to plaintiff by defendant; (2) breach of duty by allowing conduct to fall below the applicable standard of care; and (3) compensable injury proximately caused by defendant's breach of duty." *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 387 (Ind. 2016) (citation and quotation marks omitted). Although Indiana negligence law applies when determining "whether the duty was breached and whether the breach was the proximate cause of the plaintiff's injuries." *Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008), the duty is found in federal law. Specifically, 18 U.S.C. § 4042 requires the Bureau of Prisons ("BOP") to "(2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise; [and] (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States . . . ." 18 U.S.C. § 4042(a)(2), (3). A plaintiff must therefore prove that the United States

breached this duty and that the breach was the proximate cause of the plaintiff's injuries in order to prove an FTCA claim.

**C. Analysis**

The issue presented by the United States in its motion for summary judgment is narrow, and the parties' briefing on the narrow issue is appropriately succinct, given the discrete dispute between them. The United States argues that it is entitled to summary judgment as to each of Mr. Patterson's four claims insofar "as those claims pertain to Mr. Patterson's psychiatric treatment." Dkt. 59 at 1. Summary judgment is warranted, says the United States, because Mr. Patterson cannot establish, via the required expert testimony, "that the psychological care rendered to him by the Prison failed to meet the standard of care applicable to reasonably prudent providers." Dkt. 59 at 11.

Mr. Patterson correctly recognizes that the United States "does not seek summary judgment on non-psychiatric medical issues or other negligence (such as that of its prison guards)," which means that for the purposes of this motion Mr. Patterson "must only demonstrate a genuine issue on the grounds [the United States] asserts." Dkt. 71 at 1. In other words, the sole question is whether Mr. Patterson has presented sufficient evidence to allow a reasonable jury to conclude that his psychiatric care fell below the standard of care.

Mr. Patterson presents the testimony of experts Dr. Erica Kane, a psychologist, and Dr. Benjamin Loveridge, M.D. Dr. Kane's testimony is most germane to the instant motion given that the narrow issue presented concerns Mr. Patterson's psychiatric care. She states that "the standard of care was not met concerning the assessment, care and treatment of Mr. Patterson's mental health issues while he was incarcerated in Terre Haute." Dkt. 71-2 at 2. She identifies ten specific ways in which the psychiatric care received by Mr. Patterson fell below the standard of care:

(1) record keeping, (2) risk assessment, (3) suicide assessment and intervention, (4) treatment planning, (5) communicating with other providers regarding care, (6) accurate diagnosis, (7) suicide watch/attempt follow-up, (8) medication monitoring, (9) adhering to American Psychological Association, and American Psychiatric Association practice guidelines for assessing and treating patients with suicidal behaviors, and (10) adhering to common practice guidelines for mental health treatment.

Dkt. 71-2 at 16.

Notably, the United States' own expert, psychiatrist Dr. Tracy D. Gunter, echoes some of the concerns raised by Dr. Kane. Although Dr. Gunter ultimately concludes that any negligence by staff at USP-TH was not "*a direct cause* of his self-inflicted injuries," her testimony regarding the standard of care is more equivocal. Dkt. 59-2 at 18 (emphasis added). For example, Dr. Gunter states that "[t]he documentation of Mr. Patterson's medications and compliance in the psychology notes was at times inaccurate and it is not at all clear whether psychology staff had ready access to medical notes or not." Dkt. 59-2 at 14. Further, she reports the following regarding the use of medication and the coordination of Mr. Patterson's care:

> Medical staff appeared ill equipped to deal with [Mr. Patterson's] medication management . . . . The diagnostic impressions do not coordinate with those of the mental health providers, nor do they reflect the condition actually being treated. There was no plan in place for judicious use of medications, coordination of medication with behavioral interventions, or monitoring of target symptoms. There also does not appear to have been simultaneous multidisciplinary consultation between medical, mental health, and security personnel at any point in the current record.

Dkt. 59-2 at 14.

The foregoing evidence is sufficient to create a genuine issue of material as to whether Mr. Patterson's psychiatric care fell below the standard of care. This necessitates the denial of the United States' motion for partial summary judgment. The United States implicitly accepts this in its reply brief, at least with respect to Mr. Patterson's second and fourth claims. But it argues that

Dr. Kane's testimony does not create a factual dispute with regard to the psychiatric care Mr. Patterson received leading up to the suicide attempts set forth in Claims 1 and 3.

As to Claim 1, the United States argues that while Dr. Kane criticizes the fact that Mr. Patterson's suicide risk level was only increased to moderate after he attempted to hang himself on October 22, 2012, "there does not appear to be an assertion that the psychological caregivers at the BOP were negligent in treating him prior to the October 22, 2012, hanging." Dkt. 74 at 1. As to Claim 3, the United States points out that Dr. Kane takes issue with the fact that Mr. Patterson was permitted to acquire razor blades and the means to hang himself, but this was the responsibility of non-medical providers given that the mental health providers "instructed that [Mr.] Patterson was to be restricted to a bare mattress and tear-resistant smock." Dkt. 74 at 2 (citing Dkt. 59-2 at 16).

These arguments, however, ignore that much of Dr. Kane's report and her conclusions criticize the entirety of the psychiatric care received by Mr. Patterson at USP-TH. Indeed, the ten areas of deficiency identified by Dr. Kane set forth above apply to the entirety of Mr. Patterson's psychiatric care. Further examples from Dr. Kane's testimony reinforce that, in Dr. Kane's opinion, the entirety of Mr. Patterson's care was deficient. Dr. Kane attests that, as a general matter, the "failure to use experienced Psychologists or Psychiatrists to manage Mr. Patterson's complex case resulted in substandard care." Dkt. 71-2 at 4. Among the most critical statements by Dr. Kane, which also applies to the entirety of Mr. Patterson's care, is that the records kept by USP-TH "seem to be sparse at best, and at worst may be construed as unethical per American Psychological Association (APA) Record Keep Guidelines. In many instances, reports contradict each other, and it is evident that providers were not collaborating regarding Mr. Patterson's care." Dkt. 71-2 at 13. Relatedly, Dr. Kane observed that, "[h]ad there been more consistency in

documenting diagnoses, it is possible that an appropriate treatment plan could have been put into place to avoid self-injurious behavior and suicidal gestures." Dkt. 71-2 at 15. The United States' own expert, Dr. Gunter, similarly expresses concerns about Mr. Patterson's care in its entirety, stating that "[t]here was no plan in place for judicious use of medications, coordination of medication with behavioral interventions, or monitoring of target symptoms. There also does not appear to have been simultaneous multidisciplinary consultation between medical, mental health, and security personnel *at any point in the current record*." Dkt. 59-2 at 14 (emphasis added). The foregoing evidence of deficiencies in the entirety of Mr. Patterson's psychiatric care place in dispute whether Mr. Patterson received adequate psychiatric care, including with respect to Claims 1 and 3.

In sum, Mr. Patterson's evidence is sufficient to create a genuine issue of material fact as to the narrow issue presented by the United States' motion for summary judgment—that is, whether he received negligent psychiatric care as to his first four claims. Simply put, the parties' evidence presents the prototypical "battle of the experts," which requires a trial for the factfinder "to determine what weight and credibility to give the testimony of each expert." *Gilca v. United States*, 572 F.3d 407, 414 (7th Cir. 2009); *see Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008) ("[I]n a case of duel experts . . . it is left to the trier of fact . . . to decide how to weigh the competing expert testimony."). Accordingly, the United States' motion for summary judgment [dkt. 58] is **denied**.

## IV.
## Further Proceedings

The Magistrate Judge is requested to set this matter for a telephonic status conference to discuss the further development and resolution of this action, whether by settlement or trial.

The clerk is **directed** to update the docket to reflect that the United States of America is the only defendant in this action.

**IT IS SO ORDERED.**

Date: ____1/17/2017_____

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Electronically Registered Counsel